UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LEAH ROBEIN HECK                                    CIVIL ACTION

VERSUS                                              NO. 15-3483

CAROLYN W. COLVIN, ACTING                           SECTION "E" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Leah Robein Heck, seeks judicial review pursuant to Section 405(g) of
the Social Security Act (the "Act") of the final decision of the Commissioner of the
Social Security Administration ("Commissioner"), denying plaintiff's claim for disability
insurance benefits ("DIB") under Title II of the Act.  42 U.S.C. § 423.  This matter was
referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local
Rule 73.2(B).

I.   PROCEDURAL HISTORY

Heck filed her application for DIB on January 23, 2013, alleging disability
beginning June 10, 2006, due to "bipolar 1 mixed rapid cycling," migraines and manic
depression. (Tr. 101-04, 112, 116).  After her claims were denied at the agency level, she
requested a hearing before an Administrative Law Judge (ALJ), which was held on
October 23, 2013.  (Tr. 26-45).  The ALJ issued a decision denying the application on
March 14, 2014. (Tr. 11-19).  After the Appeals Council denied review on July 14, 2015,

the ALJ's decision became the Commissioner's final decision for purposes of this court's review.  (Tr. 1-6).

Plaintiff filed a timely memorandum in support of her appeal.  Record Doc. No. 14.  Defendant filed a timely reply memorandum.  Record Doc. No. 15.

II.    <u>STATEMENT OF ISSUES ON APPEAL</u>

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ failed to consider plaintiff's severe impairment of migraine headaches.

B.    The ALJ erred by finding that Heck's mental disorder does not meet Section 12.04 of the listing of impairments.

C.    The ALJ failed to give proper weight to the treating psychiatrist's opinion and to resolve properly any claimed inconsistencies between that opinion and the evidence of record.

D.    The ALJ improperly discounted Heck's credibility.

E.    The ALJ failed to consider a closed period of disability.

F.    The ALJ failed to analyze plaintiff's ability to obtain and maintain employment.

G.    The ALJ failed to consider the side effects of Heck's medication.

H.    Substantial evidence does not support the availability of jobs in significant numbers that plaintiff can perform.

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

1.   Plaintiff meets the insured status requirements of the Act through December 31, 2011, and must establish disability on or before that date in order to be entitled to DIB.

2.   She has not engaged in substantial activity since the alleged onset date of June 10, 2006.

3.   Heck has severe impairments consisting of degenerative disc disease of the lumbar spine, status-post fusion surgery with instrumentation and its removal; remote history of knee surgery; and bipolar disorder.

4.   Through the date last insured, plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1, specifically including Listing 12.04 for affective disorders.

5.   Heck has the residual functional capacity to perform sedentary work, except that she can lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk for a total of two hours in an eight-hour day; sit for six hours in an eight-hour day; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; understand, remember and carry out simple, repetitive, routine work; concentrate for two-hour blocks of time; and maintain a pace required to perform simple work.

6.   Heck's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.  However, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

7.   Plaintiff cannot perform her past relevant work as a receptionist, court runner/general office clerk and babysitter.

8.   Considering her age, education, work experience and residual functional capacity, jobs existed in significant numbers in the national economy through her date last insured that Heck could perform, such as general office clerk, interviewer, and reception and information clerk.

9.      Plaintiff was not under a disability from June 10, 2006, the alleged onset
        date, through December 31, 2011, the date last insured.

(Tr. 11, 13-15, 17-19).

IV.   ANALYSIS

       A.     Standards of Review

The function of this court on judicial review is limited to determining whether

there is substantial evidence in the record to support the final decision of the

Commissioner as trier of fact and whether the Commissioner applied the appropriate

legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F.

App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir.

2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v.

Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a

scintilla but less than a preponderance and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389,

401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at

363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record,

try the issues de novo or substitute its judgment for the Commissioner's, even if the

evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v.

Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448,

452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the

courts, must resolve conflicts in the evidence.  McCaskill v. Dep't of Health & Human Servs., No. 15-60304, 2016 WL 700220, at *4 (5th Cir. Feb. 22, 2016) (citing Perez, 415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2013).  The regulations include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.[1]  Id. §§ 404.1520, 416.920;

Alexander v. Astrue, 412 F.  App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue,

501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461.  The five-step inquiry

terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If

she successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is found not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Heck testified at the hearing that she suffers from rapid cycling bipolar disorder, which she said means that she does not know from one minute to the next how she is going to feel.  She stated that she also has a bad back and two bad knees.  She said she has experienced bipolar disorder problems since she was a teenager, but was not diagnosed properly until she started seeing Dr. Frederic Henderson in 2008, and is still working with him.  She stated that she has bad manic highs, during which she is very angry and upset, blacks out and cannot remember what she said or did.  Plaintiff testified that she might then go into a manic depression, during which she feels almost suicidal, is dysfunctional, stays to herself and does not talk to anyone.  She said she cannot predict when she might have a manic high.  She said it depends on what is happening and can

vary from moment to moment.  She testified that she was having the same symptoms between the date she stopped working in 2006 and the end of 2011.  (Tr. 31-32).

Plaintiff said she had back surgery once and a second procedure to remove the hardware from her back.  She stated that the back surgery helped a little.  She testified that she wakes up in pain every morning and sometimes cannot get out of bed.  She said her medications cause drowsiness and "could also wipe out my . . . white blood cell count," so she has to have blood work every week before she can fill her prescription.

Heck testified that she and her second husband between them have seven children ages two to eleven, five of whom are in school.   She said she sometimes cannot get out of bed until 9:00 or 10:00 a.m. because of her medications.  (Tr. 32-33).  She stated that she "wake[s] up in an okay mood" some days, but on other days "I wake up and just don't feel like getting out of bed or doing anything and then some mornings I wake up angry and can't function there either."  (Tr. 33).  She testified that a friend helps her with the two youngest children from 8:30 a.m. to 4:00 p.m. daily during the week because she has difficulty lifting the children, changing diapers and otherwise taking care of them. Heck stated that her friend also helps her and makes sure she is all right when she has her "bipolar moments."  (Tr. 33).

Plaintiff said she had worked for several years at her father's law firm as a court runner and receptionist.  (Tr. 33-34).  She recalled that clients sometimes triggered her bipolar symptoms and she started crying when they were mean to her, but she tried her

best not to be mean to them.  She stated that, when she worked, she could not sit for very long because of her back and had to keep moving around.

Heck testified that she is unable to work for eight hours per day because her medications make her too tired to arrive at 8:00 a.m. and because she does not know how she will feel during the day.  She said she suffers from bad migraines almost every day and does not know when they will occur.  She stated that she was treated for migraines between 2006 and 2011, but that her current doctors still do not understand why she has them so often.  (Tr. 34-35).

Plaintiff stated that she and her husband have two two-year-old children who are six months apart in age, one of whom is her own and the other is her stepchild.  She said she has two seven-year-olds, one her own and the other a stepdaughter, a ten-year-old stepdaughter and her own eleven-year-old daughter.  She said she married for the second time in 2011 or 2012 and that all seven children live with her, although the two stepdaughters sometimes stay with their mother.  (Tr. 35-36).

Heck testified that she had back surgery in November 2008 and went to physical therapy for her back during her pregnancy.  (Tr. 36).  She said she took only Tylenol when she was pregnant and could not take her other medications.  She said her mood was up and down during her pregnancies and she had postpartum depression after the births.

Plaintiff stated that she pays her friend $100 per week to help with her children.  She testified that her husband sometimes works as a roofer, but has medical issues that

9

prevent him from working full-time.  She said she receives food stamps and $1,000 per month from an annuity related to an accident.

Heck testified that she stopped working as a receptionist because her back bothered her and her bipolar symptoms went up and down.  (Tr. 38).  She stated that she had not been properly diagnosed and that her treatment at that time made her mental problems worse.  She said she and her first husband decided in June 2006 that she would stay home with their newborn second daughter so they would not have to pay another daycare fee, which they could not afford when their oldest child was already in daycare.

Plaintiff said she sees Dr. Henderson every one to three weeks, depending on how she feels.  (Tr. 39-40).  She testified that she can call and ask to see him earlier than her next appointment if she does not feel good.  She said she takes "a lot of stuff," but could not remember the names of her medications.  She stated that Dr. Henderson recently prescribed something new that he said has possible side effects of muscle stiffness and "my eyes could roll back of my head and I [would] have to go to the hospital and get them to reverse it."  (Tr. 40).  She said her mother pays for Dr. Henderson's treatment.

Heck testified that, in addition to her receptionist duties at the law firm, she was a court runner, which involved picking up and delivering documents to and from clients, filing papers at different courthouses and serving subpoenas.  She said she rarely drives now and did not drive much between 2006 and 2011 because she did not think she should drive when taking her medications.  (Tr. 41).

C.    Vocational Expert Testimony

A vocational expert, Patricia Knight, testified at the hearing that plaintiff's former work as a receptionist was semi-skilled and sedentary.  Knight stated that, while the job of court runner is not listed in the Dictionary of Occupational Titles, she would classify it as a general office clerk, which is semi-skilled and light.  She said that plaintiff also worked as a babysitter, which is semi-skilled and medium work. (Tr. 42).

The ALJ posed a hypothetical of a person with the same age, education and work experience as Heck, who can occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds; stand and/or walk for a total of two hours and sit for six hours in an eight-hour day; never climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  Knight testified that such a person could perform plaintiff's past relevant work as a receptionist, as listed in the Dictionary of Occupational Titles, but not as Heck actually performed it as a receptionist combined with a court runner.  The vocational expert stated that there are more than 8,000 sedentary, semi-skilled receptionist jobs in Louisiana and more than 599,000 such jobs in the United States.  (Tr. 43).

The ALJ modified the hypothetical to add that the claimant can understand, remember and carry out simple, repetitive, routine work; concentrate for two-hour blocks of time; and maintain the pace required to perform simple work.  Knight testified that such a person could perform the representative jobs of general office clerk, of which

11

there are 1,246 in Louisiana and 98,844 in the United States; interviewer, of which there are 452 in Louisiana and 33,386 nationally; and unskilled reception and information clerk, of which there are 1,228 in Louisiana and 85,666 nationally.  (Tr. 44).

The ALJ posed a third hypothetical of a person with the same limitations who has a variable ability to regulate her moods, such that she is occasionally likely to display behavioral extremes that would be distracting to others, or she would be distracted by others.  Knight stated that such an individual would not be able to perform any jobs. Finally, the ALJ posited a claimant who is unable to attend work consistently, so that she is likely to miss one-third of the work time, whether daily or yearly.  The vocational expert testified that this person would not be able to engage in any jobs.  (Tr. 44).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 16-17).  Although the more than 3,000-page administrative record in this case is voluminous, the ALJ accurately noted that the size of the record alone does not indicate that the claimant is disabled because "the record is replete with duplicates, contains substantial pre-alleged onset date and post-date last insured evidence, and contains evidence pertaining to a 3rd party lawsuit that is not pertinent to the disability adjudication." (Tr. 17).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

12

E.   Plaintiff's Appeal

1.   The ALJ did not err by failing to find that plaintiff's migraine headaches were a severe impairment.

Plaintiff argues that the ALJ erred by failing to find at the second step of the sequential evaluation that Heck's migraine condition is a severe impairment and by failing to include migraine headaches in the ALJ's residual functional capacity findings. In the Fifth Circuit, "[a]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902 n.1 (5th Cir. 2010) (quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)); accord Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985). The ALJ in the instant case cited the relevant standard.

The ALJ determines the "medical severity" of the claimant's medically determinable impairments at step two. 20 C.F.R. § 404.1520(a)(4)(ii). When the ALJ proceeded beyond step two to find at a subsequent step that a claimant is not disabled, plaintiff's argument that the ALJ failed to find that a particular impairment is severe

> is inapposite because the ALJ did not [deny] plaintiff's benefits based on a finding that [her] impairments are not severe. See Chapparo v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application of Stone standard irrelevant to disposition of case if outcome of case [did] not turn on issue of severity); see also Shipley v. Director of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987). The ALJ's report contains a statement of the Stone standard and a determination that as it applied to this case, [at least one of claimant's several alleged

13

> impairments] is a severe impairment. . . . The ALJ then proceeded to the next step of the sequential evaluation and assessed whether an impairment or a combination of plaintiff's impairments met or exceeded the severity of the impairments listed in the appendix. See 20 C.F.R. § 404.1594(f)(2). In the absence of a "non-severe" finding as to any one of plaintiff's impairments and a decision to [deny] plaintiff's benefits based on a "non-severe" finding, plaintiff cannot complain that any prejudice resulted from the ALJ's performance at this stage in the evaluation. See Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) (decision will not be reversed where claimant makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002); see also Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012) (any error in not following Stone procedures at step two was harmless when ALJ found at step five that plaintiff was not disabled by his severe impairments); Bradshaw v. Astrue, No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing Robinson v. Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915 F.2d 151, 154 n.1 (5th Cir. 1990); Chapparo, 815 F.2d at 1011) ("In more recent cases, the Fifth Circuit has found no merit to claimants' arguments of ALJ error arising out of the failure to correctly apply or state the Stone standard where the sequential evaluation process proceeds past step 2."); accord Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012) (citing Castile v. Astrue, 617 F.3d 923, 927-28 (7th Cir. 2010)); Delia v. Comm'r of Soc. Sec., 433 F. App'x 885, 887 (11th Cir. 2011) (citing Reeves v. Heckler, 734 F.2d 519, 524 (11th Cir. 1984)); Nejat v. Comm'r of Soc. Sec., 359 F. App'x 574, 577 (6th Cir. 2009) (citing Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987)).

14

> Because the ALJ did not summarily dispose of Plaintiff's claims at Step Two, but instead determined that Plaintiff had at least one severe impairment and proceeded to Step Four [or Five] to determine that Plaintiff was not disabled, the proper focus here is whether substantial evidence supports the ALJ's residual functional capacity . . . assessment and ultimate determination that Plaintiff was not disabled.

Lavery v. Astrue, No. V-11-3, 2012 WL 3276711, at *5 (S.D. Tex. Aug. 8, 2012) (citing

Chaparro, 815 F.2d at 1011) (footnote and quotation omitted).

Having found that Heck had severe impairments, the ALJ proceeded through

subsequent steps of the evaluation, considered all of the evidence concerning plaintiff's

medically determinable impairments, determined her residual functional capacity and

found at step five that she is capable of performing sedentary work with the restrictions

noted in the opinion.  Although the ALJ did not discuss plaintiff's migraines specifically,

> "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." [Plaintiff] has noted several occasions where the ALJ did not thoroughly address each aspect of the record.  Yet when dealing with such an extensive and multi-faceted record, there will always be some evidence that is not specifically discussed in the Commissioner's decision. Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record, and it is here.

Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011) (quoting Mays v. Bowen, 837

F.2d 1362, 1364 (5th Cir. 1988)) (citing Anderson v. Sullivan, 887 F.2d 630, 634 (5th

Cir. 1989).  Heck must show that the ALJ's procedural error, if any, in failing to address

her migraine headaches specifically prejudiced plaintiff's substantive rights.  Audler v.

Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

The ALJ's failures to discuss Heck's migraine headaches specifically and to find that they were severe are irrelevant and non-prejudicial to plaintiff. Even if the court were to review the ALJ's step two determination, substantial evidence supports her finding that Heck's migraines were not severe during the relevant time period of June 10, 2006, through December 31, 2011.

Plaintiff argues that she "underwent significant treatment for this condition with Dr. Houser." Record Doc. No. 14 at p. 15. James M. Houser, M.D., first saw Heck for complaints of migraines on February 18, 2009. He treated plaintiff with medication that helped reduce the frequency and severity of her headaches over the next few months. (Tr. 328-32). Heck did not see Dr. Houser again until more than one year later, after she went to the emergency room on October 18, 2010, for a moderately severe migraine headache. Intravenous drug treatment in the hospital relieved her pain almost fully. (Tr. 2109-12). She saw Dr. Houser on November 1, 2010, complaining of a severe, persistent headache for three weeks. (Tr. 327). Dr. Houser diagnosed intractable migraine and admitted her to the hospital on November 2, 2010, for a DHE (dihydroergotamine) protocol.[2] The migraine cycle broke on the second day and Heck was discharged

---

[2]Dihydroergotamine and ergotamine are ergot alkaloids. "They are used to treat severe, throbbing headaches, such as migraine and cluster headaches. . . . Because these medicines can cause serious side effects, they are usually used for patients whose headaches are not relieved by acetaminophen, aspirin, or other pain relievers." Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/headache-medicine-ergot-derivative-containing-oral-route-parenteral-route-rectal-route/description/drg-20070161 (drug information provided by Micromedex) (visited Mar. 22, 2016).

headache-free.  (Tr. 286-92).  Plaintiff saw Dr. Houser for followup a week later and had

an MRI of her brain on November 12, 2010, which was normal.  (Tr. 325-26).  Heck

returned to Dr. Houser for a single visit in February 2012.  (Tr. 320-21).  She did not see

Dr. Houser again until June 2013.  (Tr. 2994-98).

On this record, substantial evidence supports the ALJ's finding that Heck failed

to carry her burden to establish that her migraine headaches were a severe impairment

on or before December 31, 2011.  Accordingly, this assignment of error is meritless.

2.    The ALJ did not err by finding that Heck's bipolar disorder does not
meet Listing 12.04.

Plaintiff argues that the ALJ erred by finding at the third step of the sequential

evaluation that Heck's bipolar disorder does not meet Listing 12.04.  The ALJ discussed

Listing 12.04 and found that Heck did not meet the required two out of four elements of

paragraph B of the listing because she had only mild restriction in activities of daily

living; mild difficulties in social functioning; moderate difficulties in concentration,

persistence or pace; and one or two episodes of decompensation[3] due to exacerbations

of family stressors.  The ALJ also found that Heck did not satisfy the alternative criteria

of paragraph C of Listing 12.04.  (Tr. 15).

---

[3]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs
accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of
daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20
C.F.R. § 12.00(C)(4).

Whether an impairment or combination of impairments meets a listing is a medical question that can be answered <u>only</u> by medical evidence.  20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990); <u>McKnight v. Astrue</u>, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), <u>report & recommendation adopted</u>, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), <u>aff'd</u>, 340 F. App'x 176 (5th Cir. 2009).  "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." <u>Anderson v. Astrue</u>, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), <u>report & recommendation adopted</u>, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990); <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994)).

Plaintiff "must demonstrate that [her] impairment meets <u>all</u> the specified medical criteria of the listing, rather than merely some of the criteria."  <u>McCaskill</u>, 2016 WL 700220, at *2.  "An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify."  <u>Gewin v. Astrue</u>, No. 10-1008, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), <u>report & recommendation adopted</u>, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (citing <u>Zebley</u>, 493 U.S. at 530-31; <u>Selders</u>, 914 F.2d at 620); <u>accord</u> <u>Taylor v. Astrue</u>, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8

18

(N.D. Tex. June 27, 2011), report & recommendation adopted, 2011 WL 4091503 (N.D. Tex. Sept. 14, 2011), aff'd, 706 F.3d 600 (5th Cir. 2012).

Thus, Heck must identify specific medical evidence demonstrating that she meets all the criteria of Listing 12.04 for an affective disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2013).  She must show either that she meets the requirements of both paragraphs A and B of the listing or that she meets the requirements of paragraph C.

The Commissioner does not dispute that Heck's condition satisfies paragraph A for a medically documented, persistent bipolar syndrome.  Paragraph B requires an additional showing that the disorder results in at least two of the following:  "1. Marked restriction of activities of daily living; 2. Marked difficulties in maintaining social functioning; 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  Id. §§ 12.04(B). "Marked" means "more than moderate, but less than extreme."  Id. § 12.00(C).

Alternatively, paragraph C requires medical evidence establishing:

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1.  Repeated episodes of decompensation, each of extended duration; or
2. . . . [not relevant in the instant case]; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id.

Heck relies in large part on her own testimony about her symptoms of bipolar disorder. However, her testimony is not <u>medical</u> evidence, which is required to meet the objective tests of the listings. <u>Id.</u> §§ 404.1528, 416.928. She also relies on the opinions of her treating psychiatrist, Dr. Henderson, on a mental impairment questionnaire form dated July 29, 2013 (Tr. 2679-84), as supplemented on August 2, 2013. (Tr. 2685). The ALJ did not accord controlling weight to Dr. Henderson's opinions and rejected them to the extent they indicate that Heck is unable to work. (Tr. 17). Although Heck argues in one of her assignments of error that the ALJ failed to weigh Dr. Henderson's opinions properly, the ALJ followed proper legal standards, and substantial evidence supports her decision with respect to the opinions on the questionnaire, as explained in the next section of these findings and recommendation.

Substantial evidence supports the ALJ's finding that plaintiff does not meet Listing 12.04. The ALJ found that the medical records do not document repeated episodes of decompensation of extended duration, which are defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). The evidence substantially supports the ALJ's finding regarding this identical element in paragraphs B and C(1) of the listing.

20

Heck was hospitalized from May 29 to June 3, 2009, with a discharge diagnosis of bipolar disorder II,[4] most recent episode mixed.[5]  (Tr. 185-90, 200-04).  She had another episode of apparent decompensation on January 13, 2013, three-and-one-half years <u>after</u> the previous episode and thirteen months <u>after</u> her date last insured, when she was admitted to the hospital with depression and suicidal ideation, and was discharged with a diagnosis of bipolar disorder, most recent episode depressed, moderate.  (Tr. 339-45, 355-56, 2803-04, 2804).  Dr. Henderson opined in his questionnaire responses that Heck did <u>not</u> have decompensation episodes of <u>extended</u> duration during any one-year period.  (Tr. 2683).  Thus, the medical evidence substantially supports the ALJ's finding that Heck did not meet the decompensation element of paragraph B or C of Listing 12.04.

The evidence substantially supports the ALJ's findings as to the three functional areas of paragraph B.  The ALJ found that Heck had mild restriction in her activities of daily living, mild difficulties in social functioning and moderate difficulties in concentration, persistence and pace.  As to activities of daily living, the record, including

---

[4]The diagnostic criteria for bipolar II disorder are "at least one major depressive episode lasting at least two weeks and at least one hypomanic episode lasting at least four days, but [the patient has] never had a manic episode."   Mayo Clinic website, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/symptoms/con-20027544 (citing Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM-5)) (visited Mar. 21, 2016). Mania is "excitement of psychotic proportions manifested by mental and physical hyperactivity, disorganization of behavior, and elevation of mood; specifically:  the manic phase of bipolar disorder." <u>MedlinePlus Medical Dictionary</u>, http://c.merriam-webster.com/medlineplus/mania.  Hypomania is "a mild mania." <u>Id.</u>, http://c.merriam-webster.com/medlineplus/hypomania.

[5]"A mixed episode blends depressive and manic or hypomanic features; the criteria for both mania and depression are met."   <u>The Merck Manuals</u> (2016), http://www.merckmanuals.com/professional/psychiatric_disorders/mood_disorders/bipolar_disorders.html (visited Mar. 21, 2016).

plaintiff's testimony and her Function Report dated April 1, 2013 (Tr. 148-52), shows that she cared for multiple children and her husband, bathed herself, needed no reminders to take care of her personal needs, prepared meals, helped with the laundry, went outside daily with her children, occasionally drove, shopped for groceries and children's needs, visited with her relatives and in-laws, and attended her children's school functions.  She told Dr. Henderson in August and September 2009 that she was doing well, staying active with her children and cleaning when she felt agitated.  (Tr. 425, 427, 429).  On June 16, 2009, Heck told her therapist, licensed clinical social worker Maria Klette-Ketchum, that one of her strengths was taking care of children.  (Tr. 2666).

With respect to social functioning, the ALJ noted that Heck cared for seven children, five of whom were in school.  (Tr. 15, 35-36, 148).  Heck reported to Klette-Ketchum in July 2009 that she had flown to Washington to pick up her stepdaughter and had "really enjoyed" her four-day stay there with her husband's ex-wife and daughter. (Tr. 2671).  She told  Klette-Ketchum on July 5, 2010, that she was going out socially with friends (Tr. 2675), and reported on August 16, 2010, that she was happy with the man she was dating.  The ALJ noted that, although plaintiff had experienced anxiety stressors secondary to her then-cheating husband during 2009 and 2010, she had since remarried.  (Tr. 15, 35).  On January 23, 2012, Heck told Dr. Henderson that she was in a better relationship since her divorce and had a baby in August 2011.  (Tr. 457).  She

was noted to have good family and community support when she was admitted to LSU Bogalusa Medical Center on January 13, 2013.  (Tr. 344).

As to concentration, persistence and pace, a psychiatric examination by Larry Warner, M.D., on January 11, 2010, found that plaintiff's thought process was linear, logical and goal directed.  Although Dr. Warner noted that Heck was impulsive at times when cycling through a manic state and had poor coping skills, the psychiatrist found that plaintiff's abstract reasoning, arithmetical skills, affect, memory, attention span and ability to concentrate were all within normal limits, and that she exhibited intact insight and fair judgment.  (Tr. 225-27).  Even when Heck was admitted to the hospital with depression and suicidal ideation on January 13, 2013, her mental status examination by Richard Lee Burns, M.D., two days later revealed that she was oriented to person, place, time and situation; was a reliable historian; had good recall of recent and remote events; had a good ability to pay attention and concentrate; and had fair impulse control, insight and judgment.  (Tr. 344).  Dr. Burns noted in his discharge summary on January 18, 2013, that Heck had been "very active, participated in groups and activities and got a lot of benefit from it" while in the hospital.  (Tr. 341).  Accordingly, substantial evidence supports the ALJ's finding that plaintiff did <u>not</u> have marked difficulties in at least two of the three areas of functioning in paragraph B of Listing 12.04.

Finally, as to paragraph C(3) of the listing, Heck has not identified substantial evidence of a history of one or more years' inability to function outside a highly

23

supportive living arrangement, with an indication of continued need for such an arrangement during the relevant time period. The Commissioner's regulations define the effects of structured settings as follows.

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F).

On July 29, 2013, Dr. Henderson responded to a preprinted question on a form questionnaire that tracks the language of Listing 12.04(C)(3), without any narrative explanation, that Heck has a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (Tr. 2683). However, the record indicates that Heck lived serially with her husbands and children without any evidence of the type of highly structured, supportive situation contemplated by the listing. The evidence of her activities of daily living and social functioning described above is also evidence that plaintiff is able to function outside her home environment. The treatment notes of Dr. Henderson and Klette-Ketchum do not substantially support that she needed a highly structured, supportive setting to function for one or more years during the relevant time period. Compare Mozingo v. Bowen, 885 F.2d 865, 1989 WL 106814, at *2-3 (4th Cir. 1989) (Plaintiff with borderline personality disorder attended, almost daily for three years, a

24

group therapy program that tried to eliminate any type of pressure and to help patients adjust through work, activities of daily living and socialization.  Plaintiff usually performed well in that highly structured setting, but was unable to deal with people outside it.); Moore v. Colvin, No. 14CV2361-LAB(KSC), 2016 WL 791149, at *30 (S.D. Cal. Feb. 10, 2016), report & recommendation adopted, 2016 WL 759886 (S.D. Cal. Feb. 26, 2016) (Plaintiff is unable to function outside highly structured settings when his anxiety, depression and chronic pain "get the better of him every time he leaves a structured setting, resulting in a relapse of his alcohol dependence and homelessness. Then, he repeatedly returns to the structured setting of treatment and rehabilitation, where his symptoms improve, but not enough to lead to a higher, more independent level of functioning with a job and permanent housing."); Moore v. Colvin, No. 5:12-CV-120-C, 2013 WL 3156505, at *5 (N.D. Tex. June 21, 2013) (Plaintiff with bipolar, major depressive and antisocial personality disorders "remained in highly supportive living arrangements such as jail, psychiatric facilities [for extended periods], and his family ranch where he lived with his mother throughout the relevant period. . . .  The evidence also indicates a continued need for such an arrangement . . . ."); and Herrington v. Astrue, No. H-08-3204, 2010 WL 816650, at *8 (S.D. Tex. Mar. 4, 2010) (Although plaintiff lived by himself, he required "highly supportive and assistive measures" from his mother daily "to ensure that Herrington takes his medication and eats.  In addition, the ALJ did not reject . . . [a medical expert's opinion] that the only thing that kept Herrington from

25

de-stabilizing was his mother's oversight."); with Gibson v. Colvin, No. CV 6:14-4772-MGL-KFM, 2016 WL 639253, at *13 (D.S.C. Jan. 28, 2016), report & recommendation adopted, 2016 WL 631983 (D.S.C. Feb. 17, 2016) (ALJ properly gave little weight to treating psychiatrist's opinion on a form that plaintiff could not function outside highly structured and supportive living arrangement when the form portrayed plaintiff as much more limited than did the doctor's treatment notes and nothing in the notes indicated that plaintiff had significant limitation in activities of daily living); Thornhill v. Colvin, No. 3:14-CV-335-M, 2015 WL 232844, at *6 (N.D. Tex. Jan. 16, 2015) (evidence did not support plaintiff's contention that she needed a highly structured and supportive environment when she had less than moderate symptoms from depression and anxiety, lived with her husband, performed basic domestic duties and had quit her job partly for reasons other than her medical condition); and Patterson v. Astrue, No. 07-418-FJP-CN, 2008 WL 4510036, at *5 (M.D. La. Sept. 30, 2008) aff'd, 324 F. App'x 419 (5th Cir. 2009) (Plaintiff's "role as a care giver played an integral part of [her] life while she was being treated for her bipolar disorder, and it covered a rather lengthy time period . . . . Further, it indicates that plaintiff is capable of dealing with stressful situations without . . . the need to be placed in a highly supervised living arrangement.").

Because Heck failed to carry her burden to produce substantial evidence that she meets every element of Listing 12.04, this assignment of error lacks merit.

3.     The ALJ applied the appropriate legal standards and adequately
       explained the weight given to Dr. Henderson's checklist opinions.

The ALJ found that plaintiff's bipolar disorder is a severe impairment, but that she can understand, remember and carry out simple, repetitive, routine work; concentrate for two-hour blocks of time; and maintain the pace required to perform simple work.  Heck argues that the ALJ failed to give proper weight to her treating psychiatrist's opinion and to resolve properly any claimed inconsistencies between that opinion and the evidence of record.

Dr. Henderson completed a preprinted "Mental Impairment Questionnaire."  (Tr. 2679-84).  There is some confusion in the record about the date of this opinion, possibly caused by a partially obscured notation in the top right corner of the first page that states "NOTE:  PLEASE ANSWER FOR THE TIME PERIOD BETWEEN JUNE 10, 2006 AND DECEMBER 31, 2011."  (Tr. 2679).  However, Dr. Henderson signed the form on July 29, 2013.  (Tr. 2684).  On August 2, 2013, in response to a query from plaintiff's attorney, the psychiatrist clarified that his opinions on the form are based on his experience with Heck from March 17, 2008, to the date of signing.  (Tr. 2685).

The form contains numerous questions, some requiring narrative answers and others merely responsive checkmarks, about plaintiff's symptoms, diagnoses, treatment and functional abilities.  As to treatment and response in general, Dr. Henderson stated that Heck has "severe to extreme symptoms requiring intensive outp[atien]t or hospital

27

treatment with periods of relative remission." He noted that plaintiff is "currently doing well [except] migraine, but relapses have been frequent and unpredictable." (Tr. 2679). In response to lengthy lists of mental abilities to do work, Dr. Henderson checked boxes indicating that Heck is capable for <u>each</u> enumerated ability of a range from "Unlimited or Very Good" to "Unable to meet competitive standards." He explained that these ranges "indicate the limits of ability to function from mood stable to extremely symptomatic. The latter can exist for long periods. Mood stability rel[6] infrequent." (Tr. 2681). Similarly, as to the three functional areas of Listing 12.04(B), Dr. Henderson indicated that Heck's limitations can each range from "None-Mild" to "Extreme." (Tr. 2683). The doctor stated that Heck "currently appears to be in remission for the 1st time this calendar year from bipolar disorder. She is currently disabled by migraine/chronic daily headache." (Tr. 2682). He further opined that Heck "has been unable to function for months at a time" and that "work stress would exacerbate illness." (Tr. 2684).

The ALJ stated that she thoroughly reviewed the extremely voluminous medical records and considered the opinion evidence in accordance with the relevant regulations. She declined to afford Dr. Henderson's opinions controlling weight, and she accepted his diagnoses and opinions concerning plaintiff's condition on the form only to the extent they were supported by the treatment records. The ALJ discussed specifically why she

---

[6]In context, this may mean "relatively."

gave only some weight to Dr. Henderson's opinions on the checklist.  Her reasons are

supported by the legal standards and substantial evidence.

> Generally,
>
> [t]he opinion of the treating physician who is familiar with the claimant's
> impairments, treatments and responses, should be accorded great weight in
> determining disability.  A treating physician's opinion on the nature and
> severity of a patient's impairment will be given controlling weight if it is
> well-supported by medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with other substantial evidence. . . .
> . . . . [T]he ALJ is free to reject the opinion of any physician when
> the evidence supports a contrary conclusion.  The treating physician's
> opinions are not conclusive.  The opinions may be assigned little or no
> weight when good cause is shown.  Good cause may permit an ALJ to
> discount the weight of a treating physician relative to other experts where
> the treating physician's evidence is conclusory, is unsupported by
> medically acceptable clinical, laboratory, or diagnostic techniques, or is
> otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).  The ALJ had good cause

to discount Dr. Henderson's opinions that conflicted with his own treatment records and

those of Klette-Ketchum.

First, appellate courts, including the Fifth Circuit, have often held that checklist

opinions are unworthy of credence when they are not adequately supported by or are

inconsistent with the medical records.  See Foster v. Astrue, 410 F. App'x 831, 833 (5th

Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony. . . .

[W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory

nature, lack of explanatory notes, or supporting objective tests and examinations, [the

treating physician's] opinion is given little weight.'"); <u>Peck v. Barnhart</u>, 214 F. App'x 730, 738 (10th Cir. 2006) (ALJ provided legitimate reasons for rejecting doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" nor justified by the treatment notes); <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value"); <u>Johnson v. Apfel</u>, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was contradicted by evidence in the record); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993) (quotation omitted) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [When] these so-called reports are unaccompanied by thorough written reports, their reliability is suspect . . . ."); <u>Frey v. Bowen</u>, 816 F.2d 508, 515 (10th Cir. 1987) ("Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence.").

Second, as the ALJ stated, to the extent that Dr. Henderson described long-term, extreme limitations based on plaintiff's bipolar disorder, that opinion was inconsistent with the treatment records. The ALJ also noted that many of plaintiff's "mental symptoms . . . centered on her then cheating husband, the dissolution of that marriage, and attendant custody issues," but that she had since remarried and was raising seven

children, indicating that she felt capable of doing more than the extreme limitations suggested by Dr. Henderson would allow.  (Tr. 17).

The medical records contain no evidence of treatment for mental health problems from the alleged onset date of June 10, 2006, until March 17, 2008, when Heck first saw Dr. Henderson, who diagnosed her with bipolar disorder II and treated her only through July 1, 2008.  Although Dr. Henderson noted that plaintiff had ongoing stressors related to her family situation, she exhibited some improvement in her depression and anxiety during those three months.  (Tr. 392-93, 401, 404, 406).  A note by her treating orthopedic surgeon, John B. Logan, M.D., on November 18, 2008, states that Heck's mood, affect, attention span and concentration were normal and that she reported being happy since her lumbar surgery on November 4, 2008.  (Tr. 1292-93).

Heck did not return to see Dr. Henderson until May 11, 2009.  She complained of mood swings and being on an emotional roller coaster because of anger at her husband, who had cheated on her.  (Tr. 396).  She was hospitalized for her mental symptoms from May 29 to June 3, 2009.  She had a discharge diagnosis of bipolar disorder II, most recent episode mixed, with significant psychosocial stressors related to marital problems and poor coping skills.  Her condition improved with treatment and she was stable upon discharge.  (Tr. 185-90, 200-04).

Plaintiff had four psychotherapy sessions with her counselor, Klette-Ketchum, in June and July 2009.  (Tr. 2665-71).  Klette-Ketchum noted each time that Heck had

31

ongoing marital issues and anger at her husband.  (Tr. 2665-71).  Plaintiff continued to see Dr. Henderson over the next six months.  His notes indicate that, although Heck still had some symptoms, she improved with treatment and was considered stable as of December 22, 2009.  (Tr. 416, 418-19, 421, 425, 427, 429, 434).

Plaintiff went to the Ochsner Hospital emergency room on January 11, 2010.  She reportedly felt manic, had been increasingly angry with her husband for the past few days, had hit him and could no longer control her thoughts.  Upon psychiatric evaluation, she did not meet the criteria for inpatient admission.  Despite her impulsivity, she was euthymic[7] and had an essentially normal mental status examination.  She was discharged in satisfactory condition with a diagnosis of bipolar disorder type I,[8] [illegible] mania; and poor coping skills.  (Tr. 208-11, 224-27).  Dr. Henderson referred Heck for unexplained "day treatment" on January 12, 2010.  (Tr. 435).  There is no evidence that she followed up on this referral.  She saw Dr. Henderson again in January and February 2010, and her symptoms improved.  (Tr. 446, 449).

The next set of treatment notes from April through August 2010 state that Heck had separated from and was in the midst of divorcing her husband.  (Tr. 452, 2672-78).  In April 2010, plaintiff told Dr. Henderson that she was not having mood swings and

---

[7]Euthymia is "1. Joyfulness; mental peace and tranquility.  2. Moderation of mood, not manic or depressed."  Stedmans Medical Dictionary on Westlaw at STEDMANS 307600.

[8]Bipolar I disorder is characterized by at least one manic episode, which may be preceded by or followed by hypomanic or major depressive episodes.

wanted to get a job.  Dr. Henderson found her reasonably stable, but still with marital stressors.  (Tr. 451).  Heck continued to report her emotional problems, frustration and irritation with her husband to Dr. Henderson through June 2010.  (Tr. 450-52).  She resumed therapy with Klette-Ketchum on June 9, 2010, and reported the same emotional and financial problems with her husband to Klette-Ketchum through August 2010.  (Tr. 2672-78).  Heck took her medications inconsistently during this time period.  (Tr. 2677).

Dr. Henderson stated on June 22, 2010, that Heck had been "doing fine" until she stopped taking her medications about two weeks earlier (apparently in anticipation of removal of hardware from her back, which occurred on Thursday, June 17, 2010 (Tr. 924)), and then had a manic episode the day after the surgery.  She told Dr. Henderson that she had seen her counselor the previous night before she came to see the doctor and that she still felt "edgy."  (Tr. 450).  On June 21, 2010, Heck reported the same post-operative manic episode to Klette-Ketchum.  Plaintiff told Klette-Ketchum that she had threatened her mother, chased her husband and hit him when he tried to make her take her pain medication, and that the police had been called.  Klette-Ketchum's impression was that Heck was unstable without medications.  (Tr. 2674).

There are no records of any further psychological treatment from August 2010 through plaintiff's last insured date of December 31, 2011.  During her hospitalization for DHE protocol on November 2, 2010, Sun Chaney, M.D., noted that Heck's bipolar

symptoms were under control without any medications and that she would follow up with Dr. Henderson as an outpatient.  (Tr. 287).

Heck next saw Dr. Henderson on January 23, 2012, 18 months after her last visit to him.  She was divorced, had a baby with her new boyfriend in August 2011 and was raising the baby and her boyfriend's 11-month-old child.  Heck reported that she had been "all right" during her pregnancy, but was not getting much sleep, had low energy and felt that her mood symptoms were resuming.  (Tr. 457).  On February 14, 2012, she told Dr. Henderson that she felt better.  (Tr. 461).

Heck did not seek further mental health treatment until January 13, 2013, eleven months later and thirteen months <u>after</u> her date last insured, when she presented to the Lakeview Regional Medical Center emergency room with depression and suicidal ideation exacerbated by family stress.  (Tr. 355-56, 2803-04, 2804).  She was admitted to LSU Bogalusa Medical Center for treatment the same day.  By January 18, 2013, she was "much improved" and was discharged with a diagnosis of bipolar disorder, most recent episode depressed, moderate; moderate stressors; and a fair prognosis.  She was directed to return to medication management and psychotherapy.  (Tr. 339-45).

On February 12, 2013, Heck had another manic bipolar episode with suicidal ideation for the past few days.  She was taken to the Lakeview Regional Medical Center emergency room by police after she had punched a window, trying to hurt herself. Although the emergency room records indicate that she was approved for admission to

34

a psychiatric facility at Greenbrier Behavioral Healthcare Hospital, the administrative record contains no records from that hospital.  (Tr. 349-53, 2893).

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman, 544 F. App'x at 360 ; Stringer, 465 F. App'x at 364.  "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Newton, 209 F.3d at 455 (quotation omitted).  The medical records described above are substantial evidence supporting the ALJ's decision not to afford controlling weight to Dr. Henderson's opinions to the extent they conflicted with the treatment notes and supporting the ALJ's finding that many of plaintiff's problems during the relevant time period centered on her cheating husband, the dissolution of that marriage and attendant custody issues.

Plaintiff argues incorrectly that the Fifth Circuit's opinion in Newton requires the ALJ to consider expressly the six factors in 20 C.F.R. § 404.1527 whenever the ALJ discounts a treating physician's opinion.  Newton "conclude[d] that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth

35

in 20 C.F.R. § 404.1527(d)(2)."  Newton, 209 F.3d at 453 (emphasis added); see also

Thibodeaux v. Astrue, 324 F. App'x 440, 445 (5th Cir. 2009) (citing Newton, 209 F.3d

at 453, 456) (When the record contained "reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, . . . the ALJ was not

required to apply the criteria set forth in 20 C.F.R. § 404.1527(d)(2).").  The record in the

instant case contains ample evidence from Heck's treating physicians to controvert the

extreme limitations in Dr. Henderson's checklist opinion.

"Conflicts of evidence are for the Commissioner, not the courts, to resolve."  Byrd

v. Comm'r of Soc. Sec., 368 F. App'x 542, 543 (5th Cir. 2010) (quotation omitted).  As

she is obligated to do, the ALJ in the instant case weighed conflicting medical evidence,

resolved the conflict in favor of the opinions of Dr. Henderson that were supported by

the mental health treatment records, and adequately explained her reasons for not giving

controlling weight to Dr. Henderson's opinions that described extreme limitations.

Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008); Kirksey v. Shalala, 21 F.3d

1109, 1994 WL 171704, at *2 (5th Cir. 1994); Griego v. Sullivan, 940 F.2d 942, 945 (5th

Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).

"[T]he Act empowers the ALJ to analyze the physicians' testimony.  Substantial

evidence supports the ALJ's decision to disregard the physicians' conclusions.  That

basis is enough to survive our review."  Greenspan v. Shalala, 38 F.3d 232, 237 (5th

Cir. 1994).  Although "[o]ne may make reasonable arguments that the evidence should

36

have been assessed differently in the first instance, . . . those arguments are beyond the limited role of the court in the review process." <u>Lee o/b/o R.L. v. Comm'r, Soc. Sec. Admin.</u>, No. 11-cv-0910, 2013 WL 639060, at *4 (W.D. La. Jan. 29, 2013), <u>report & recommendation adopted</u>, 2013 WL 639058 (W.D. La. Feb. 21, 2013).  Accordingly, this assignment of error lacks merit.

    4.    The ALJ's assessment of Heck's credibility is supported by substantial evidence.

Heck bears the burden of proving that she suffers from a disability under the first four parts of the sequential inquiry.  <u>Perez</u>, 415 F.3d at 461.  Determining the credibility of her subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence.  <u>Luckey</u>, 458 F. App'x at 326 (citing <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985)); <u>Perez</u>, 415 F.3d at 462.

The ALJ did not "ignore" plaintiff's diagnosis of bipolar disorder, as Heck contends, but found that her bipolar disorder is a severe impairment.  Nonetheless, the mere diagnosis of an impairment does not establish disability.  <u>Bordelon v. Astrue</u>, 281 F. App'x 418, 421 (5th Cir. 2008) (citing <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983)); <u>McLendon v. Barnhart</u>, 184 F. App'x 430, 431 (5th Cir. 2006); <u>Harris v. Barnhart</u>, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998); <u>Jones v. Sullivan</u>, 954 F.2d 125, 128 (3d Cir. 1991); <u>Arroyo v. Sec'y of Health & Human Servs.</u>, 932 F.2d 82, 87-88 (1st Cir. 1991); <u>Martin v. Chater</u>, No. 95

C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)).

The Fifth Circuit has held that the ALJ is bound to explain her reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in [her] articulation.'" Hernandez v. Astrue, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citing Newton, 209 F.3d at 459); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citing Newton, 209 F.3d at 459). The ALJ's explanation of her reasons for finding plaintiff not entirely credible is all that is required. Undheim v. Barnhart, 214 F. App'x 448, 450-51 (5th Cir. 2007) (citing 20 C.F.R. § 404.1529(c); Falco, 27 F.3d at 164); James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

The ALJ is not required to discuss every piece of evidence, particularly "when dealing with such an extensive and multi-faceted record." Giles, 433 F. App'x at 251

(citing Anderson, 887 F.2d at 634; Mays, 837 F.2d at 1364).  "The ALJ is not required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility."  Clary v. Barnhart, 214 F. App'x 479, 482 (5th Cir. 2007) (citing Falco, 27 F.3d at 163). The ALJ is required only to review the entire record, resolve evidentiary conflicts and state specific reasons for her credibility findings, supported by the evidence.  Luckey, 458 F. App'x at 324; Giles, 433 F. App'x at 249; Newton, 209 F.3d at 452.

The ALJ complied with these requirements in the instant case.  Heck basically argues that the ALJ should have believed her testimony, despite evidence in the extremely voluminous record that undermined her testimony, including much of the medical evidence summarized above.  Plaintiff's subjective complaints may be discounted when, as here, the alleged symptoms are not consistent with the objective medical evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Hernandez, 278 F. App'x at 340 (citing Anthony, 954 F.2d at 295); Jones v. Heckler, 702 F.2d 616, 621 n.4 (5th Cir. 1983)).  Substantial evidence supports the ALJ's credibility finding. Accordingly, this assignment of error lacks merit.

     5.    The ALJ was not required to consider a closed period of disability.

Heck argues that the ALJ's failure to make a determination regarding a closed period of disability is not supported by substantial evidence.  She contends that the ALJ should at the very least have held that plaintiff was disabled during her recovery from

back surgery in November 2008 and, citing Social Security Ruling 82-52, that the ALJ was required to present a specific rationale if she denied a claim on the basis of insufficient duration.

"In considering 'duration,' it is the inability to engage in [substantial gainful employment] because of the impairment that must last the required 12-month period." Frisby v. Comm'r of Soc. Sec., No. 13-3119, 2015 WL 1859053, at *5 (W.D. La. Apr. 22, 2015), aff'd, No. 15-30545, 2016 WL 363121 (5th Cir. Jan. 28, 2016) (citing Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) "(the inability to work, not just the impairment upon which it is based, must last 12 months)"); SSR 82-52).  The ALJ did not deny Heck's claim based on insufficient duration of her inability to engage in substantial gainful employment, but on the basis that Heck had the residual functional capacity to perform work that is available in significant numbers.  Plaintiff fails to identify substantial evidence that she was disabled by her severe impairments from working for any period of 12 continuous months.

The ALJ was not required to discuss her rationale for not awarding a closed period of disability when she found that no such disability occurred.  Accordingly, this assignment of error lacks merit.

6.    The ALJ was not required to analyze separately Heck's ability to obtain and maintain employment.

Citing Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002), and Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2003), plaintiff argues that the ALJ erroneously failed to analyze Heck's ability to obtain and maintain employment.  In Watson, the Fifth Circuit

> held that the ALJ erred by failing to determine whether the plaintiff was capable not only of obtaining but also maintaining employment.  [Watson, 288 F.3d at 218].  The [residual functional capacity] rules . . . make clear that the [residual functional capacity] is a measure of the plaintiff's capacity to perform work "on a regular and continuing basis," and in most cases the ability to maintain employment is adequately taken into account in the [residual functional capacity] determination.  See, e.g., [Perez, 415 F.3d at 465; Frank, 326 F.3d at 619].  In decisions following Watson, the Fifth Circuit has clearly rejected the idea that an ALJ must in all cases make a separate finding that the claimant has the ability to maintain employment.  See Frank, 326 F.3d at 619.  Any such required extra finding must be predicated on the claimant having an impairment that waxes and wanes in its manifestation of disabling symptoms.  See Dunbar v. Barnhart, 330 F.3d 670, 671 (5th Cir. 2003); Frank, 326 F.3d at 619.
>
>      The Court of Appeals in Frank explained that "Watson requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." Frank, 326 F.3d at 619. Frank gave an example of evidence that might necessitate a separate finding of a claimant's ability to maintain employment:  "For example, if [the Plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination."  Id.

Thornhill, 2015 WL 232844, at *7 (emphasis added).

Plaintiff argues that her symptoms from both her lumbar pain and her bipolar disorder wax and wane, such that the ALJ was required to make a separate finding that

she can maintain employment.  As to her back pain, Heck cites the statements of her orthopedic surgeon, Dr. Logan, in a summary of his treatment records on June 30, 2011, about two and one-half years post-lumbar fusion and one year post-removal of hardware from her back.  Plaintiff emphasizes Dr. Logan's opinion that she "show[s] a rather classical waxing and waning of low back symptomology variably discussed as good days and bad days.  She, more likely than not, will continue on this type of symptomatic course and will need to adjust her activities as appropriate for that."  (Tr. 2063).

However, Dr. Logan also stated that Heck would continue with conservative management of her post-surgery, "successfully treated" degenerative disc disease; would likely need nonsteroidal anti-inflammatory drugs daily, but would probably need muscle relaxers and narcotic medications only intermittently; was not currently taking any medication because she was pregnant; and might be a future candidate for selective steroid injections and physical therapy about once a year, if she experienced intermittent significant pain that could not be controlled with oral medications.  (Tr. 2063-64).  According to Dr. Logan's last treatment note on May 9, 2011, plaintiff's physical examination was normal and her pain was tolerable without medication, although she could take Motrin as needed while pregnant.  She was to return to see him as needed.  (Tr. 2040-43).  Dr. Logan did not opine in his narrative report or his treatment notes that Heck was incapable of performing any functions that might be necessary for work.  The medical records reveal no additional treatment for back pain in 2012.  When Heck sought

psychiatric treatment on January 13, 2013, her medical history included intermittent back pain, but her physical examination was unremarkable, her physical health was noted to be "reasonably good" and she was not treated for back pain during her five-day hospitalization. (Tr. 341-42, 344).

Evidence that a claimant has "good days and bad days" does not rise to the level anticipated by Frank and Watson and does not require a separate finding of an ability to maintain employment. Perez, 415 F.3d at 465. Even though a claimant needs periodic treatment for pain, such as epidural injections, that "is simply not sufficient to bring [plaintiff's] case within the realm of disablement envisioned by the Frank court. It is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain." Id. In addition, the ALJ found plaintiff's testimony about her pain not entirely credible. That finding is supported by substantial evidence, including the evidence summarized in the preceding paragraph of these findings and recommendation.

As to her bipolar disorder, Heck cites Dr. Henderson's description in his questionnaire responses on July 29, 2013, of "her clinical findings as extreme insomnia, agitation, loss of control, suicidal and violent preoccupations and that she has a prognosis for frequent and unpredictable relapses. (Rec. p. 2679)." Plaintiff's memorandum, Record Doc. No. 14 at pp. 17-18. These truncated findings by Dr. Henderson span the entire course of his treatment records from 2008 to 2013, but, as previously explained,

43

the ALJ declined to give controlling weight to Dr. Henderson's opinions of extreme limitations because of conflicts with the treatment notes, and that finding is supported by substantial evidence.

Without evidence substantially showing that Heck "could work only in short spurts, or that [her] condition otherwise waxes and wanes in a manner that prevents [her] from maintaining employment . . . or that the ALJ failed to include any fluctuations in [her] symptoms in" her residual functional capacity determination, plaintiff's "ability to maintain employment is subsumed in the [residual functional capacity] determination." Barratt v. Astrue, No. 07-51067, 2008 WL 2325636, at *2 (5th Cir. June 6, 2008) (citing Perez, 415 F.3d at 465); see also Deihs v. Colvin, No. A-14-CV-495-AWA, 2015 WL 1651443, at *5 n.1 (W.D. Tex. Apr. 13, 2015) ("[N]umerous courts have required something more than a mere diagnosis of bipolar disorder to determine that the impairment waxes and wanes in its manifestation of disabling symptoms such that a separate finding regarding the claimant's ability to maintain work is required.") (citing Barratt, 2008 WL 2325636, at *1-2; Latoksi v. Astrue, No. 2:09-CV-198, 2011 WL 4526086, at *14-15 (N.D. Tex. Sept. 13, 2011), report & recommendation adopted, 2011 WL 4526086 (N.D. Tex. Sept. 28, 2011); Todd v. Astrue, No. H-09-2687, 2010 WL 3894102, at *13 (S.D. Tex. Sept. 30, 2010); McPeters v. Astrue, No. 1:07-CV-112-C, 2008 WL 4414542, at *13 (N.D. Tex. Sept. 30, 2008)); see also Thornhill, 2015 WL

232844, at *7-8 (plaintiff's allegations that her depression and anxiety waxed and waned were insufficient to require separate finding whether she can maintain employment).

The ALJ incorporated into her residual functional capacity assessment all of plaintiff's functional limitations that she found credible.  Under established Fifth Circuit law, the ALJ's residual functional capacity determination incorporates a finding that Heck can sustain work activities on a regular and continuing basis.  Barratt, 2008 WL 2325636, at *1-2; Castillo v. Barnhart, 151 F. App'x 334, 335-36 (5th Cir. 2005); Frank, 326 F.3d at 619.  Accordingly, this assignment of error lacks merit.

> 7.   Substantial evidence supports the ALJ's findings regarding the side effects of Heck's medication.

Heck argues that the ALJ ignored evidence of significant side effects caused by her prescription medications, which the ALJ should have included in her residual functional capacity assessment and the hypothetical to the vocational expert. The ALJ is required to consider all of the evidence presented, including "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms."  20 C.F.R. § 404.1529(c)(3)(iv).  In support of her argument, Heck cites only her own testimony and Dr. Henderson's response of "drowsiness secondary to clozapine"[9] to the request on the questionnaire that he "describe any side

---

[9]Clozapine (generic name: clozapine) is "used to treat severely ill people with schizophrenia who do not respond to standard treatment.  Clozapine is also used to reduce the risk of repeated suicidal behavior in people with schizophrenia or schizoaffective disorder who are at risk for experiencing suicidal behavior again."  PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/clozapine

effects of medications that may have implications for working." (Tr. 2679). As previously discussed, the ALJ's finding that plaintiff's testimony was not entirely credible is supported by substantial evidence.

Dr. Henderson's form response does not clarify whether Heck took clozapine during the relevant time period or, if she did, the extent of the drowsiness on her functioning or what the "implications for working" were. As previously explained, the ALJ had good cause to discount Dr. Henderson's opinions on the questionnaire to the extent they conflicted with the contemporaneous treatment records. The medical records contain numerous instances when plaintiff affirmatively reported having no side effects from her medications and/or she did not report drowsiness as a side effect to Dr. Henderson or her therapist, Klette-Ketchum. (Tr. 406, 409, 413, 416, 419, 421, 425, 427, 429, 434, 449, 459, 461, 463, 469-70, 472, 2669-78).

These records substantially support the ALJ's decision not to include drowsiness as a factor in her residual functional capacity determination or the hypothetical to the vocational expert. Accordingly, this assignment of error lacks merit.

8.   Substantial evidence supports the availability of jobs in significant numbers that plaintiff can perform.

The Commissioner bears the burden at step five of the sequential analysis to show that work exists in the national economy in significant numbers in either the region

_____

(visited Mar. 28, 2016).

where plaintiff lives or several other regions of the country.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(a).  Heck argues that substantial evidence does not support the availability of jobs in significant numbers that she can perform.  This argument is frivolous.

As plaintiff acknowledges, neither the statute, the regulations nor the Fifth Circuit have established a bright-line rule as to what constitutes a "significant number" of jobs. Kelly v. Astrue, No. 10-1198, 2011 WL 3563197, at *17 (E.D. La. June 27, 2011), report & recommendation adopted, 2011 WL 3565481 (E.D. La. Aug. 12, 2011); Alexander v. Comm'r of Soc. Sec., No. 08-1570, 2010 WL 2571980, at *4 (W.D. La. June 8, 2010), judgment modified on other grounds, 2010 WL 2484219 (W.D. La. June 10, 2010), aff'd, 412 F. App'x 719 (5th Cir. 2011).  However, as examples of jobs that a person with Heck's residual functional capacity could perform, the vocational expert testified to the existence of 1,246 general office clerk jobs in Louisiana and 98,844 in the United States; 452 interviewer jobs in Louisiana and 33,386 nationally; and 1,228 unskilled reception and information clerk jobs in Louisiana and 85,666 nationally.

These numbers are clearly significant enough to carry the Commissioner's burden at step five.  See Monroe v. Shalala, 55 F.3d 633, 1995 WL 313965, at *8 (5th Cir. 1995) (997 of one and 2,262 of another job in Louisiana were significant numbers) (citing Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992) (650 to 900 jobs); Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988) (1,350 jobs)); Taylor v. Colvin, No. 14-0573,

47

2015 WL 3603957, at *14 (E.D. La. June 5, 2015) (84,890 jobs in the U.S. and 1,235 in Louisiana); Thomas v. Astrue, No. 11-02290, 2012 WL 6707105, at *7 (E.D. La. Nov. 26, 2012), report & recommendation adopted, 2012 WL 6707038 (E.D. La. Dec. 21, 2012), aff'd, 539 F. App'x 644 (5th Cir. 2013) (431,391 jobs in the national economy and 7,680 jobs in the local economy); Kelly, 2011 WL 3563197, at *17 (9,000 jobs); McGee v. Astrue, No. 08-0831, 2009 WL 2841113, at *6 n.14 (W.D. La. Aug. 28, 2009) (citing Johnson v. Chater, 108 F.3d 178,181 (8th Cir. 1997)) (18,760 and 150 jobs).

Heck does not dispute the vocational expert's qualifications or the reliability of the sources that Knight used.  Plaintiff has not rebutted this evidence on which the ALJ appropriately relied.  Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ applied the appropriate legal standards and substantial evidence supports her findings that plaintiff's migraine headaches are not severe, Heck's mental disorder does not meet Section 12.04 of the listing of impairments and the opinions of her treating psychiatrist are not entitled to controlling weight.  Substantial evidence supports the ALJ's findings with respect to plaintiff's credibility, residual functional capacity and ability to perform work that exists in significant numbers in the economy.  The ALJ was not required to consider a closed period of disability or to analyze separately Heck's ability to obtain and maintain employment.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[10]

New Orleans, Louisiana, this ____5th____ day of April, 2016.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[10]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.